**Entered on Docket**
**June 18, 2019**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



The following constitutes the order of the Court.
Signed: June 18, 2019

_____
**Stephen L. Johnson**
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

In re

**STEVE ANTHONY CASTILLO**,

Debtor.

Case No. 18-52006 SLJ

Chapter 13

Date: May 30, 2019
Time: 10:00 a.m.
Ctrm: 3099

**MEMORANDUM DECISION OVERRULING OBJECTION TO CONFIRMATION AND GRANTING IN PART AND DENYING IN PART MOTION TO SET GENERAL UNSECURED CLAIM**

## I. INTRODUCTION

This dispute centers on whether a debtor's cash down payment should be applied to the negative equity or to the price of the new vehicle when a purchase-money loan consists of both the price of the new vehicle and the negative equity from the trade-in vehicle. Because a creditor does not have a purchase money security interest in the negative equity of

MEMORANDUM DECISION

the trade-in vehicle, the answer will determine what portion of creditor's claim is unsecured. Looking to California law and the vehicle purchase contract at issue, I conclude that the cash down payment was applied to reduce the negative equity. Nothing in the Bankruptcy Code changes that result.

The matter came on for hearing at the above-referenced date and time. I made an oral ruling on the record. However, because this issue has arisen with increasing frequency in other cases, I decided a written decision would be more appropriate.[1]

## II. BACKGROUND

### A. Vehicle Purchase

The relevant facts are not disputed. On or about August 19, 2017, within 910 days prior to the filing of this case, Debtor purchased a new Honda Accord ("Honda") under a Retail Installment Sale Contract – Simple Finance Charge (With Arbitration Provision) (the "Contract"). Debtor paid $23,691 for the Honda. With taxes and licensing, the "out the door" price was $26,283.57.

As part of the transaction, Debtor traded in his old vehicle, a 2014 Jaguar ("Jaguar"). He was given $22,000 in credit for the Jaguar. But at the time of the transaction, he owed $27,551.49 to JP Morgan Chase ("Chase") who had a security interest in the Jaguar. This difference between the trade-in value and the loan balance owed to Chase, which I will call "gross negative equity," was $5,551.49.

To summarize, Debtor had to pay the following to acquire the Honda and pay off the Jaguar:

|  |  |
|---|---|
| Price of (new) Honda | $26,283.57 |
| Gross Negative Equity on Jaguar | $5,551.49 |
| Total | $31,835.06 |

Debtor made a small cash down payment of $1,500 as part of the transaction.

---

[1] This written decision memorializes the oral ruling. However, to the extent the memorandum differs from the oral ruling, the memorandum controls.

MEMORANDUM DECISION

|   |   |   |
|---|---|---|
| Total needed | | $31,835.06 |
| Cash down payment | | <u>$1,500.00</u> |
| Total Transaction Balance | | <u>$30,335.06</u> |

The $30,335.06 due to close the transaction was financed by American Honda Finance Corporation ("Creditor").

### B. Chapter 13 Filing and Dispute over Creditor's Claim

Debtor filed this chapter 13 case on August 31, 2018.[2] Debtor filed a chapter 13 plan ("Plan") which provided that Creditor's claim in the amount of $28,750 would be paid at 4% interest in monthly payments of $230.

Creditor filed an objection to confirmation ("Confirmation Objection") asserting that the 4% interest rate was too low under *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). Creditor also filed a proof of claim in the amount of $28,459.90, with fully secured status.

On October 16, 2018, Debtor filed a Motion to Set General Unsecured Claim Amount ("Bifurcate Motion"). It sought to bifurcate the Creditor's claim into secured and unsecured portions. He argued that under the Ninth Circuit's holding in *In re Penrod*, 611 F.3d 1158 (9th Cir. 2010), he was entitled to treat the gross negative equity of $5,551.49 financed by Creditor as an unsecured claim. No order was issued on the Bifurcate Motion because it is subsumed in this dispute.[3]

Creditor set a contested confirmation hearing on its Confirmation Objection. In its status statement, Creditor identified two issues requiring court determination: (1) the interest rate, and (2) a dispute on the amount of the negative equity. The parties settled the interest

---

[2] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[3] In short, as the court indicated at the hearing on February 28, 2019, the parties combined Creditor's Confirmation Objection and Debtor's Bifurcate Motion as outstanding issues requiring determination by the court, notwithstanding that the Bifurcate Motion was not noticed for hearing and Creditor did not file an opposition to it.

MEMORANDUM DECISION

rate dispute at the hearing on February 28, 2018, indicating on the record that they agreed to a 7% interest rate.

Because the parties did not provide any legal discussion to support their arguments on the proper treatment of the down payment, I required them to file supplemental briefs.[4]

## III. JURISDICTION

I have jurisdiction over this matter. The district courts have jurisdiction over all bankruptcy cases and over all civil proceedings arising under the Bankruptcy Code or arising in or related to a bankruptcy case. 28 U.S.C. § 1334(a)–(b). I have jurisdiction by reference from the district court. N.D. Cal. General Order No. 24, § 1.01 (May 15, 2012). This proceeding arises in or is related to the above-captioned bankruptcy case.

## IV. ISSUES

The parties here do not dispute that Debtor incurred the debt at issue within 910 days of the petition date, that the collateral for the debt is a motor vehicle, that the vehicle was acquired for the Debtor's personal use, and that *Penrod* applies so that the negative equity financed by Creditor is not a secured claim. The sole issue for resolution is the amount of the negative equity. Specifically, did the Debtor's cash payment at the time of the vehicle purchase reduce the negative equity or was it applied to the cash purchase price of the new vehicle?

Debtor's position is that according to *Penrod*, negative equity is simply the difference between the remaining loan balance on the trade-in vehicle ($27,551.49) and the value of the trade-in vehicle ($22,000), which is $5,551.49. The down payment is irrelevant.

Creditor's position is that the Contract applied the $1,500 cash down payment to reduce the negative equity of $5,551.49, resulting in a net negative equity of $4,051.49.

---

[4] I ordered two rounds of supplemental briefing because the parties failed to cite and discuss any of the relevant case law in their initial supplemental briefs.

## V. DISCUSSION

### A. *Penrod* Does Not Control

The parties discuss the Ninth Circuit's *Penrod* decision at length. It is relevant but does not control the outcome here. As a preliminary matter, one must understand what *Penrod* actually decided.

In *Penrod*, 611 F.3d 1158, the creditor which had financed debtor's vehicle purchase objected to the chapter 13 plan which proposed to bifurcate its claim into secured and unsecured portions on the premise that the negative equity financed by the creditor was not purchase money security interest and therefore unsecured under § 1325(a)(*). Thus, the issue facing the Ninth Circuit was whether a creditor has a purchase money security interest in the negative equity of a vehicle traded in at the time of a new vehicle purchase. After analyzing the definition of purchase money security interest, the Ninth Circuit held that it does not.

Debtor argues that because *Penrod* concluded negative equity is antecedent debt, or "old value," and held a creditor can only obtain a purchase money security interest in "new value," his cash down payment, which is a new payment, must be applied to the new value, which is the price of the Honda. This proposition finds no support in *Penrod*. Simply put, the question was not before the Ninth Circuit and it did not decide the issue.

As part of the vehicle purchase transaction, the debtor in *Penrod* made a $1,000 down payment. *Id.*, at 1160. After concluding that a creditor does not have a purchase money security interest in the negative equity of a vehicle traded in during a new vehicle purchase, the Ninth Circuit remanded the case to the bankruptcy court to decide how to treat the cash down payment. *Id.,* at 1164.

If there is any doubt, footnote 1 conclusively forecloses Debtor's attempt to expand the *Penrod* opinion. The footnote states, in relevant part, "the Appellant claims that down payments and manufacturer rebates should have been deducted from the gross negative equity amount . . . *We express no opinion on the merits of Appellant's argument*. Rather, we remand

MEMORANDUM DECISION

to the bankruptcy court to examine the Appellant's arguments and determine how credit should be given for the rebate and the down payment." *Id.* at 1159, n.1.

In short, *Penrod* did not decide the issue before me.

B. <u>Applying the Down Payment is a Matter of Contract (State) Law</u>

Many bankruptcy courts have dealt with this question, though. Although there is some variance in the conclusion, all the courts look to the contract to make their determination.

In *In re Siemers*, 2011 WL 5598349 (Bankr. W.D. Wash. 2011), the debtor purchased a new vehicle and traded in an old vehicle in the same transaction. The bank financing the new loan gave debtor $30,000 for the trade-in vehicle, but debtor had a loan balance of $40,304 on the trade-in owed to another lender. Debtor made a $6,200 down payment. Just like in this case, the contract indicated that the bank paid the prior lender $4,104 "for Prior Credit or Lease Balance."

As here, the debtor in *Siemers* argued that the negative equity should be $10,304, which was the difference between the trade-in value and the remaining loan balance on the prior vehicle. Creditor argued that the down payment of $6,200 should be treated as reducing the negative equity to $4,104. The bankruptcy court held that the contract controlled and "[t]he contract clearly indicates that the $6,200 down payment was applied to reduce the negative equity and was not part of the [new vehicle's] purchase price." *Id.*, at *2.

Other courts have also looked to the contract to reach their decisions. *See, e.g., In re Gray*, 382 B.R. 438 (Bankr. E.D. Tenn. 2008)("The method of accounting used in the debtor's contract . . . might be considered the best or even the required method of accounting to show that a rebate or cash down payment was applied to paying negative equity."); *In re Hayes*, 376 B.R. 655 (M.D. Tenn 2007)(applying cash down payment to new vehicle price based on the contract); *In re Burt*, 378 B.R. 352 (Bankr. D. Utah 2007)(applying down payment and rebate to reduce negative equity as provided by the contract); *In re Conyers*, 379 B.R. 576 (Bankr. M.D.N.C. 2007)(applying a rebate of $2,500 to reduce negative

MEMORANDUM DECISION

equity as provided by the contract); *In re Petrocci*, 370 B.R. 489 (Bankr. N.D.N.Y. 2007)(reducing negative equity by a rebate as provided by the contract); and *In re Pajot*, 371 B.R. 139 (Bankr. E.D. Va. 2007), rev'd on other grounds (applying rebate to the price of new vehicle instead of negative equity as provided by the contract).

Reliance on state law is consistent with the long-standing bankruptcy principle that in the absence of any controlling federal law, property and interests in property are determined by state law. *See Butner v. United States*, 440 U.S. 48 (1979).

Debtor argues that these cases are irrelevant because they are from circuits which have held a creditor has a purchase money security interest in the negative equity of a debtor's trade-in vehicle, in contravention to *Penrod*. That is not entirely correct.

First, the *Siemers* decision is from a bankruptcy court in Washington state, which is part of the Ninth Circuit. And, it was decided after *Penrod*. In addition, of the cases cited above, *Hayes, Conyers,* and *Pajot* all held that negative equity was not a purchase money security interest and not a secured claim, which is entirely consistent with *Penrod*.

Second, Debtor's argument misses the point of these cases. They hold that the sales contract the parties signed should determine how to apply a cash down payment, and that is true regardless of whether a court concludes negative equity constitutes purchase money security interest or not for purpose of § 1325(a)(*). *Gray* illustrates this point. In that case, the cash down payment and rebates exceeded the negative equity. As the court observed, if the contract showed that the down payment and rebates were applied to the negative equity, it would eliminate the negative equity, and the court would not have to decide the effects of § 1325(a)(*) on the vehicle loan which was not used to pay the negative equity. *In re Gray*, 382 B.R. at 441.

C. <u>California Law and the Contract at Issue Here</u>

No one disputes that the Contract should be interpreted under California law. Debtor makes two arguments regarding the Contract. First, Debtor asserts that the amount of $4,051.49, which is the net negative equity after subtracting the cash down payment of

MEMORANDUM DECISION

$1,500 from the gross negative equity of $5,551.49, does not appear anywhere in the Contract and, in fact, the "Total Downpayment" amount in the Contract shows $0, not $4,051.49. Second, Debtor argues the allocation of the down payment in the Contract has "no legal consequence." Neither argument is persuasive.

The California legislature enacted the Automobile Sales Finance Act ("ASFA") to protect vehicle purchasers from abusive selling practices and excessive charges by requiring full disclosure of all items of cost. *See* Cal. Civ. Code § 2981 *et seq*. The ASFA governs every aspect of the disclosure and also mandates that contracts subject to its provisions must contain disclosures required by Regulation Z, which are regulations issued by the Federal Reserve Board to implement the Truth In Lending Act. Cal. Civ. Code § 2982. The Contract is subject to the requirements of ASFA.

Section 2982(a)(6)(G) of the ASFA requires the "total downpayment" to be listed as zero when the down payment amount, including trade-in value, is a negative number. That negative number should be expressed as a positive number pursuant to § 2982(a)(1)(I). Section 2982(a)(1)(I) in turn requires the disclosure of "[t]he prior credit or lease balance remaining on property being traded in[.]" Furthermore, it requires the disclosure be labeled "prior credit or lease balance."

In this case, Line 6 in the section titled Itemization of the Amount Financed of the Contract listed the value of the trade-in vehicle as $22,000, the remaining loan or lease balance of the trade-in vehicle as $27,551.49, which resulted in a net trade-in value of negative $5,551.49. Line 6(G) listed the cash down payment of $1,500. Applying the $1,500 to the net trade-in value of $5,551.49 yielded negative $4,051.49. Because this is a negative number, § 2982(a)(6)(G) requires the total down payment amount to be $0 and the amount of $4,051.49 be listed as a positive number under "Prior Credit or Lease Balance," which is in Line 1(J). In other words, contrary to Debtor's argument, California law requires the $0 figure listed in Total Downpayment at the end of Line 6.

Line 1(J) unequivocally shows that the cash down payment was applied to reduce the negative equity. It states, in full, "prior credit or lease balance *paid by Seller to JPMorgan Chase*"

MEMORANDUM DECISION

in the amount of $4,051.49 (emphasis added).[5] At this point, the gross negative equity was $5,551.49. The payment by the dealership to Chase in the lesser amount of $4,051.49 was only possible by applying the $1,500 down payment to reduce the negative equity from $5,551.49 to $4,051.49.

I also note that the current version of § 2982 was revised in 1999 to conform to Regulation Z, which requires the same down payment disclosure. *See Thompson v. 10,000 RV Sales, Inc.*, 130 Cal.App.4th 950, 969 (2005). The Official Interpretations to Regulation Z treat this Contract's method of calculating the net down payment as applying the cash down payment to reduce the negative equity. Specifically, in 12 C.F.R. § 226.2, Supp. I, ¶ 2(a)(18)-3, it states that "If the consumer makes a cash payment, creditors may, at their option, disclose the entire cash payment as down payment, or apply the cash payment first to any excess lien amount and disclose any remaining cash as the down payment." The examples in this section support a finding that the down payment was applied to the negative equity.

Debtor argues that the Contract's treatment of the $1,500 down payment has no legal consequence. Debtor did not provide any legal authority for this proposition. It would be a strange world in which contract terms were not valid and had no legal effect. I cannot ignore the clear terms of the Contract that applied the cash down payment to reduce the negative equity, as permitted under California law.

I therefore conclude that the $1,500 down payment was applied to reduce the negative equity and was not part of the purchase price of the Honda.

D.   Allocation of Prepetition Payments

In his second supplemental brief, Debtor asked for a determination regarding application of his prepetition loan payments (assuming Creditor's claim is divided between secured and unsecured claims). I will not decide this issue for several reasons. First, the issue

---

[5] In the section of the contract titled Trade-in Payoff Agreement, it states, in relevant part, "Seller agrees to pay the payoff amounts shown as the Prior Credit or Lease Balance in Trade-in Vehicle(s) to the lienholder or lessor of the trade-in vehicle(s), or its designee."

MEMORANDUM DECISION

was raised for the first time in Debtor's second supplemental brief without court authorization. Creditor was not given the opportunity to respond to this argument because the parties filed simultaneous briefs.

Second, the court has no evidence on the matter. Debtor did not provide any evidence of the amount of prepetition payments. Although Creditor filed a proof of claim showing a secured claim of $28,459, with arrears of $2,303, Debtor is silent on whether he agrees with the amount in the proof of claim. In his brief, Debtor is clear that he used the proof of claim amount "as an example" for calculation purposes.

Finally, neither party provided any legal argument in connection with the issue. Without a properly noticed motion with factual evidence and supporting legal authority, this issue is not properly before the court.

## VI. CONCLUSION

In sum, the gross negative equity in the amount of $5,551.49 was reduced by the cash down payment of $1,500 at the time of the transaction, resulting in a net negative equity of $4,051.49. Because the $4,051.49 is attributable to negative equity, it is subject to bifurcation and is an unsecured claim pursuant to *Penrod*.

I will issue separate orders overruling the Confirmation Objection and granting in part and denying in part Debtor's Bifurcate Motion.

I make no determination on how the prepetition payments made by Debtor should be allocated between the unsecured claim and the secured claim.

IT IS SO ORDERED.

\* \* \* **END OF ORDER** \* \* \*

**COURT SERVICE LIST**

[ECF recipients only]